## ERICKSON v. UNITED STATES.

(Circuit Court, D. Washington, N. D. March 23, 1901.)

1. BUILDING CONTRACT—LIGHT HOUSE—FORFEITURE FOR DELAY.

A contractor employed to build and equip a light house, and dwelling connected therewith, engaged to execute it during a part of the year when the weather was most favorable for the work, which was to be completed in October. He was prompt in providing materials, and went on the ground in April, but an inspector was not sent for three weeks thereafter, and the engineer did not stake the location of work for some days after the inspector arrived. The boilers were ready for inspection and notice given in August, but the officers delayed the inspection two months. Lumber which could have been was not inspected in time to be replaced without retarding the work. Delay in delivering the ironwork by an independent contractor prevented completion of the work during the dry season, and like delay in delivering the lantern glass prevented inclosing the tower so that cementing and painting inside should be completed before the time for completing the work expired in January, as fixed by the last extension granted. In addition, the work was retarded by a meddlesome and apparently incompetent inspector, and the weather from about the 1st of November was wet and stormy, and the work from then until completed, in March, was necessarily slow and expensive. *Held* to warrant the contractor's claim that the delay was due to the fault of the government and the elements, and that the conditions barred enforcement of any forfeiture for the delay.

2. SAME—CONSTRUCTION.

General provisions in a contract for building and equipping a light house and appurtenant buildings requiring that the boilers and everything necessary to make the structures complete and ready for use should be furnished by the contractor, whether specified or not, and that all boiler attachments should be duplicated, do not control a specific provision that only one injector and one pump should be supplied, as the latter provision must be understood to require that they should be of capacity sufficient to supply two boilers.

3. SAME—CLAIM FOR EXTRA WORK AND MATERIALS—EVIDENCE.

On an issue between the government and a light-house contractor on a claim for extra work and materials, the uncorroborated testimony of an inspector, on whom the government mainly relies, and whose credibility was impaired by prevarication and otherwise, will not be allowed to defeat the contractor's claim in so far as it is supported by the unimpeached testimony of disinterested witnesses, clearly and positively testifying to facts, part of which could apparently be determined with absolute certainty, but which was submitted by the government on his testimony alone.

4. SAME.

A building contractor cannot recover for an excessive amount of material which one of his own witnesses testified he voluntarily provided, nor for extra material which another of his witnesses testified was neces-

sary to complete the contract, which required him to furnish everything necessary, whether specified or not.

Suit to recover a balance claimed for labor performed and materials furnished in executing a contract for the construction of the Gray's Harbor light house and fog-signal station. Hearing on the merits. Findings and judgment in favor of the plaintiff for the full amount of the contract price and the value of extras.

Preston, Carr & Gilman, for plaintiff.

E. E. Cushman, Asst. U. S. Atty.

HANFORD, District Judge. In February, 1897, the government of the United States, through the agency of Capt. W. L. Fisk, of the corps of engineers, United States army, entered into a contract with the plaintiff to prepare the ground and erect buildings for the Gray's Harbor light station, in this state, under the supervision of the engineer for the Thirteenth light-house district, and according to plans and specifications and detail drawings attached to the contract. The contract included the furnishing of boilers and engines, but other ironwork necessary for the buildings and lantern glass for the light-house tower were to be furnished by other contractors. All the materials and workmanship were required to be inspected by an inspector to be employed by the engineer in charge, who was to be constantly on the ground for the purpose of seeing that all materials met the requirements of the contract, and that the work was properly done. Eight calendar months from the 18th day of February, 1897, were allowed for completion of the contract, and the contractor was subjected to a penalty of $30 per day for each day's delay exceeding the time limited, and by subsequent agreements the time limit was extended to the 18th day of January, 1898, but the contract was not completed, and the work finally accepted, until March 26, 1898, and the government has retained $2,100 from the contract price as a forfeiture, under the penalty clause, for delay. The plaintiff sues to recover the amount so retained, also to recover from the government for extras, and for losses incurred in doing work and furnishing materials not specified or required by his contract, but which were exacted as the work progressed by the inspector, acting under the authority of the engineer in charge. The plaintiff claims that the delay in completing the contract beyond the time originally specified was caused entirely by capricious and unreasonable exactions and interference with the workmen on the part of the inspector assigned to the work, and delay on the part of other contractors in furnishing the ironwork and lantern glass, and delay on the part of the government officers in inspecting the boilers and other materials, and by bad weather, and that the fault of the government officers and agents and independent contractors has the effect to entirely abrogate the penalty clause of the contract. It is an admitted fact in the case that the iron materials required were not delivered until after the time fixed by the original contract for the completion of the work, and that the lantern glass was not delivered until 20 days after the limit

fixed by the last agreement for an extension, and yet the government claims that the extensions granted were sufficient to compensate for all delays not occasioned by the contractor's own fault, and it is denied that any work or materials not specified in the contract were exacted, and it is denied that the contractor suffered any loss or expenses by arbitrary or capricious conduct on the part of the inspector.

On the face of the contract, it appears that the contractor engaged to execute the contract during that part of the year when the weather would be most favorable for such work, and the evidence proves conclusively that he made his calculations and arrangements accordingly; he was prompt in providing materials of lumber, stone, brick, gravel, and cement, and went upon the ground with laborers and teams in the month of April, but an inspector was not sent to the place until about three weeks afterwards, and stakes which had to be set by the engineer for the exact location of the different structures were not set until some days after the inspector arrived. The boilers were ready for inspection and notice given in August, but there was two months' delay on the part of the officers of the government in performing their duty in that particular. Kiln-dried flooring lumber was delivered on the ground in good season, and it could have been inspected in time to have replaced any part of it which might have been found to be unsatisfactory, without retarding the work, but, instead of acting fairly, the inspector waited until the floors were laid, and then condemned the material, and the engineer required part of the floors to be taken up and replaced with new lumber. The delay in delivering the ironwork necessarily prevented the completion of the work during the dry season of the year, and the delay in the delivery of the lantern glass prevented the inclosure of the tower, so that the cementing and painting inside could not be completed until after the expiration of the time for completing the whole work, as fixed by the last extension granted. It is also an undisputed fact that from about the 1st of November the weather was wet and stormy, so that the work from that time was necessarily slow and expensive. It is my opinion that these conditions entitle the contractor to claim that the delay was caused by the fault of the government and by the elements, and constitute a legal bar to enforcement of any forfeiture for delay.

The claim for extras is supported by clear and positive testimony, and is contradicted by the testimony of the inspector, and for the most part the questions at issue are questions of fact, which must be determined by consideration of contradictory evidence. The charge for an extra injector and an extra pump are the only items with relation to which the witnesses agree as to the facts. The contract plainly specifies that one injector and one pump should be supplied. It is admitted that two of each were furnished to satisfy the demands of the inspector and engineer, and it is claimed that two were necessary, because the contract required two boilers, and one clause of the contract provides that everything necessary to make the structures complete and ready for use shall be furnished by the contractor, whether specified or not, and another clause provides that all

boiler attachments are to be duplicated. These general provisions, however, should not control the specific provisions for one injector and one pump, and the only proper construction of the contract, in my opinion, is the construction given to it by the witness Robert Moran, who testified that these specifications would be understood by manufacturers and persons skilled in the construction of machinery to require a single injector and a single pump of capacity sufficient to supply two boilers. The theory that duplicates were necessary to make the construction complete is refuted by the fact that, although two were supplied, only one injector and one feed pump are used. With regard to all the other disputed items, there appears to me to be a clear and substantial preponderance of the evidence in favor of the plaintiff. The plaintiff and his witnesses are all men of mature experience, of sufficient intelligence to understand the matters with respect to which their testimony was given, and their testimony appears to be positive and candid. I have not found that any one who gave testimony on the plaintiff's side prevaricated with respect to any material matter, or that his testimony was overcome by a preponderance of evidence to the contrary. The case for the government rests mainly upon the unsupported testimony of Mr. C. W. Leick, who acted as inspector from the latter part of May until the 4th of December, when, on account of complaints as to his behavior, he was recalled. He would have been recalled sooner, if another inspector had been available. It is shown by the evidence that, by reason of a lack of a sufficient number of men subject to control of the engineer, Mr. Leick, who is an architect employed as a draughtsman in the engineer's office, and who had never previously been employed to oversee the actual construction of buildings, was assigned to the duty of inspecting the work under the contract, and he was given a letter of instructions which in specific terms notified him that he was to assume no responsibility for the plans and specifications, that he was not to make alterations nor permit deviations, and that he was not sent to act as a superintendent of the work, but to see that the materials furnished and the work conformed to the plans and specifications, and the instructions required him to refrain from becoming involved in any dispute or altercation with the contractor or any of his employés. Instead of obeying instructions, this inspector assumed the role of a master, and was meddlesome and tyrannical, so that the contractor's employés were irritated to such an extent that good men refused to continue on the work. In one instance, he quarreled with a carpenter while putting rustic on the outside of one of the buildings, insisting that each board should be nailed solid before the next should be placed, which the carpenter said was an impossible way of putting on tongue and grooved rustic. Harsh language was used, and the two men were about to fight, when the contractor intervened to quell the disturbance. The inspector then insisted that the carpenter should be discharged on account of the disrespect shown to himself. Some of the plaintiff's witnesses testified that this inspector was especially cross and disagreeable on the first days of the week. Mr. Leick in his testimony repelled any inference of indulgence in the use of intoxicants between

Saturday and Monday, but offers as an explanation that he was required to make reports to the engineer's office on Sundays, and in consequence of having to perform that duty he was more inclined to be cross on Mondays. This admission appears to me to be significant as an indication of the man's temper and disposition, and to that extent corroborates the plaintiff's evidence tending to prove that the work was retarded by the pettishness and arrogance of the inspector. Another incident which tends to prove his incompetency as an inspector, and also tends to impeach his credibility as a witness, is the matter of a dispute respecting the timbers used for sills of the dwelling houses. The specifications require the sills to be of cedar. The plaintiff has given testimony to the effect that Mr. Leick attempted to reject the timbers furnished on the ground that they were fir, and not cedar, and that he persisted in pronouncing the timbers fir, until Mr. Erickson sawed a piece off of one of the timbers to show the grain of it, and asked him to smell it, as the timber had a strong odor of cedar, and even then Mr. Leick refused to admit his error, but the timbers were used in spite of his objections, and the work was accepted, and this testimony is corroborated by the foreman and by other evidence. In his examination in chief, Mr. Leick met this evidence with a complete denial in toto. Then upon his cross-examination he prevaricated as follows:

"Q. Did you have a dispute or argument with Mr. Erickson as to whether the sills for the dwelling were fir or cedar? A. Sills for dwelling? Q. Whether they were fir or cedar? A. There are no sills for the dwelling. Q. Well, plates; is that another name for them? A. Well, plates; yes. Q. Did you have an argument with him whether those that he had brought there and was putting in were fir or cedar? A. Not that I know of. About a difference in the wood,—lumber? Q. Yes. A. No, sir. Q. Whether they were fir or cedar? A. No, sir; except in the quality,—yes. Q. But as to whether they were fir or cedar, that question was never mentioned? A. No. Q. What was it,—cedar? A. It was cedar. Q. Cedar was specified? A. I think that it is. Q. At any time, in discussing that, did Mr. Erickson saw off a piece of it, and ask you to smell it? A. No; I never saw Mr. Erickson have a saw in his hand. Q. This matter that I have been talking about that you call 'wall plates' are called 'sill plates' in the specifications? A. 'Sills,' I call them. 'Q. You said there were not any sills? A. No; 'wall plates,' I mean."

I will refer to one other matter which goes a long way towards impairing Mr. Leick's credibility in my estimation. The contract requires a well to supply water for the station to be dug to the depth of 13 feet. The evidence shows that, after excavating for the well had commenced, Mr. Leick interfered, and required its location to be moved a distance of 18 inches, and after the work had further progressed he required another change, putting it back to about the position where it was started. When the shaft was down 13 feet there was no water, and it had to be carried 3 or 4 feet deeper, and then an abundance of water was obtained. Mr. Leick insisted, however, in having the well sunk still deeper, and kept the men digging the well deeper, when the water was coming in so rapidly that two men were unable to keep it bailed out. On the trial, two witnesses swore positively that the depth of the well, after its completion, and after gravel had been put in to make the bottom solid, was a little

more than 23 feet, and that the suction pipe was 10 feet longer than the pipe originally provided, and that a corresponding amount of extra brickwork was required to wall up the well, and that Mr. Leick compelled the contractor to put gravel around the outside of the brick wall; that is, to fill in with gravel the space between the brick casing and the earth with gravel. Mr. Leick denies positively that he interfered at all with the location of the well, denies that he required any gravel to be put in, and says that no gravel was put in except a wagon load of screenings or refuse, which was put there to get rid of it, because there was no other place to put it. He states positively that only 790 bricks were used for the well casing in excess of the number which would have been required if the well had only been 13 feet deep, and also states positively that by actual measurement the depth of the well, when completed, was only 18 feet and 6 inches. As the plaintiff makes a charge for extra work in digging the well to a greater depth than was necessary, this matter of depth of the well is material, and either Mr. Leick or the witnesses who contradicted him in regard to it have willfully given false evidence. Presumably, the well still exists, and is the same depth that it was left by the contractor, so it is possible to determine the question for or against the plaintiff with absolute certainty. The government, however, has submitted its case on this point upon the uncorroborated testimony of Mr. Leick alone. I can find nothing in the case to justify a rejection of the testimony of the two witnesses, who appear to be candid and truthful, and are unimpeached, and are corroborated by the testimony of disinterested witnesses in other matters, where Mr. Leick has given uncorroborated testimony to the contrary. I would not hesitate to reject the testimony of Mr. Erickson and Mr. Hull in its entirety, if it was shown by a fair preponderance of the evidence that they had willfully misstated any material fact in the case, and I feel in duty bound to apply the same rule to Mr. Leick as a witness, and therefore I reject his evidence entirely, in so far as it is uncorroborated by other evidence in the case.

In all business transactions, the government, as a contractor, should be treated with the same fairness as private individuals, and should also be required to deal fairly on its part. The evidence as a whole shows that, in spite of all obstructions and annoyances, the plaintiff completed the work substantially and well, and that it was accepted as fulfillment of his contract by the government's officers. To punish him by withholding part of the contract price for his work, as a forfeiture for delay, and by refusing to pay his bill for extras when the delay was entirely caused by the incompetency of the government's agent and the failure of the other contractors, over whom he had no control, to deliver materials on time, and the bad weather in which he had to work in consequence of such delays, would be rank injustice.

I direct findings to be prepared by the plaintiff's attorneys, sustaining the allegations of the complaint, and allowing the plaintiff's claim for the full amount of the contract price for his work and the extras claimed and itemized in the complaint, making only the following deductions shown to be proper by the testimony of Mr. Hull, viz.:

Extra cost of paint on barn roof, $5; extra painting on side of barn, $6; 258 feet of extra braces for walk, not specified, should be reduced from $3.35 to $1.65; item of one foot extra height of brick foundation for dwelling houses should be reduced from $250.36 to $125. I also disallow the item of $3 for loss of coal-tar pitch, on the testimony of Mr. Wilshire, to the effect that the contractor voluntarily provided an excessive amount of coal-tar pitch. There will also be a general reduction on the bill for extras of $237.50, upon the testimony of Mr. Hull that that amount was for work and materials which were necessary to complete the contract, although not specified. As the contractor was obliged to do and furnish everything necessary, whether specified or not, to make the work complete, he must lose this amount. A judgment will be entered in favor of the plaintiff for the balance in his favor, which will appear by the findings as directed.